J-A05040-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.B., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1234 MDA 2021 |

Appeal from the Decree Entered August 19, 2021
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-9073

BEFORE:   OLSON, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED FEBRUARY 4, 2022**

J.B. ("Father") appeals from the decree entered by the Court of Common Pleas of Luzerne County involuntarily terminating Father's parental rights to his minor son, J.A.B. ("Child"), who was born in May 2010, pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).  After careful review, we affirm.

We summarize the factual background presented at the hearing held on Mother's petition to terminate Father's parental rights.   Mother and Father were married in 2005.  When the parties eventually divorced in 2014, the parties agreed without a formal custody order to share equal physical custody of Child, who was four years old at that time.  Notes of Testimony (N.T.), 2/24/21, at 6-9.

_____

[*] Former Justice specially assigned to the Superior Court.

The parties agreed that the reason for their separation was Father's substance abuse problem. *Id*. at 46, 85. Mother testified that Father would waver between excessive alcohol use and gaining sobriety for periods of time. *Id*. at 10-11. Mother recalled that when she lived with Father, he would become intoxicated several days in a row and drink a gallon of Jack Daniels whiskey each weekend. *Id*. at 42-43. Mother remembered that when Father was intoxicated, she observed he was easily angered, his speech was slurred, his eyes were bloodshot, and his hands had severe tremors. *Id*. at 45-46.

Mother testified that Father would often be unable to go to work due to his alcohol abuse and would frequently smell of alcohol on his way to work. *Id*. at 42. As such, Mother testified that she needed to work to support their family as she was the only individual in their household with steady employment. *Id*. at 45. While Mother testified that she asked Father to seek professional help for his alcohol abuse, Father denied that he needed any treatment and could stop on his own. *Id*. at 43. Father told Mother that he would consume alcohol to cope with knee pain and to "have fun." *Id*. at 44.

As a result of Father's alcohol abuse, Mother felt that Child's safety was at risk. When Mother had to leave Child at home with Father while she worked as she had no one else to watch Child, she would return home and find Father intoxicated. *Id*. at 44-45. Mother feared that Father would be unable to care for Child in the event of an emergency. *Id*.

After the parties separated, Father continued to drink excessively and Mother would remove Child from Father's home and refuse to allow visitation.

*Id*. at 47.  When Father would regain sobriety, Mother would gradually increase Father's visits with Child.  *Id*. at 12, 49.  During the time period between 2014 and 2017, Mother shared custody of Child with Father as long as Father was sober.  Mother testified that Father admitted to her that he has a problem with alcohol abuse.  *Id*. at 47-48.

In 2017, Mother filed a petition for special relief seeking sole physical and legal custody of Child after again finding Father intoxicated in his home while he had Child in his custody.  *Id*. at 48-49.  After Father failed to appear at the hearing, the trial court entered an order granting Mother sole legal custody and primary physical custody of Child.  *Id*. at 16-17.  However, the order permitted Father to have periods of visitation and partial custody dependent on the agreement of the parties and Father's sobriety.  *Id*. at 48-49.  This custody order was in effect at the time of the termination of parental rights hearing.  *Id*. at 58.

The parties continued with this arrangement in which Mother would allow Father to have custody unless Father consumed alcohol excessively.  *Id*. at 49-50.  Mother would then keep Child with her for a few weeks until she had adequate assurance that Father regained sobriety.  As Father relapsed multiple times, Mother indicated that she would be slower to permit Father to visit with Child until she believed Child was safe with him.  *Id*. at 18.

Father began to attend Alcoholic Anonymous (AA) meetings and asked Mother to attend an open meeting with him.  *Id*.  Mother indicated that she wanted Father to go to rehabilitation for his substance abuse issues, but he

declined to do so. *Id*. Father progressed to the point where he had custody of Child for a few overnight visits and was taking Child to football practice as Father helped to coach Child's team. *Id*.

In September 2019, Child went with Father to a football practice. Mother received a phone call from a parent who reported that Father was acting erratically at practice, was drinking something, and was driving Child home early. *Id*. at 22, 52. When Father arrived to drop Child off at Mother's home, Mother thought Father appeared intoxicated and smelled like a "bottle of Jack." *Id*. at 53. According to Mother, Father was irate, his eyes were bloodshot, he had body tremors, and was slurring his words. When Mother confronted Father about his drinking and driving Child from practice, Father denied it. *Id*. at 23. Mother subsequently spoke with parents of other players who indicated they also believed Father was intoxicated at the practice. *Id*. at 23-24. Mother claimed that within twenty-four hours of the incident, Father admitted he had been drinking alcohol that day. *Id*. at 24.

Mother subsequently learned that Father had consumed alcohol on other occasions while having Child in his custody. Child confirmed these accounts when he testified at a later hearing. Mother indicated that Child had told her that Father had fallen asleep numerous times and failed to feed Child. *Id*. at 65; N.T., 3/5/21, at 11. In addition, there were two incidents in which Child indicated that Father was acting strangely while driving. In the first, Father sideswiped a railing, and in another, Father accidentally left the car in neutral while Child was in the car, requiring Child to put the car in park to stop the

- 4 -

car from rolling. N.T., 3/5/21, at 13. Child indicated that Father told him not to tell his mother about these incidents because Father would get in "a lot of trouble." N.T., 2/24/21, at 65.

After the incident at Child's football practice, Mother did not agree to allow Father to have visitation with Child. *Id*. at 56. While Mother admitted Father asked to visit with Child, she indicated that nine-year-old Child felt uncomfortable and unsafe in doing so. As such, although Mother had suggested that Father could visit Child in a public place in Mother's presence, she eventually decided against this plan as Child indicated that he did not want to see Father. *Id*. at 59.

According to Mother, the last time Father reached out to Child was January 2020. *Id*. at 27. Mother indicated that Father stopped receiving text messages from Father in April 2020. *Id*. at 29-31. Mother admitted that she told Father that she would file for a Protection from Abuse order if he ever harassed her family. *Id*. at 32. Father did not take any legal action to attempt to see Child.

On September 15, 2020, Mother filed a petition to terminate Father's parental rights. The lower court held a hearing on February 24, 2021, at which Mother, Father, and Mother's husband, C.C. [("Stepfather")] testified. The trial court held an additional hearing on March 5, 2021, at which Child testified.

Father admitted that he has struggled with alcohol issues in the past but claimed to have been sober for eight months at the time of the hearing. *Id*. at 91, 94. While Father conceded that he had not had contact with Child since

September 2019, he asserted that Mother prevented him from having access to Child and threatened to file for a PFA order if Father contacted her. N.T. at 89-90. Father admitted that he never took legal action to attempt to regain visitation or custody of Child because he thought the parties' problems "would just boil over." *Id*.

By decree entered August 19, 2021, the lower court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b). Thereafter, on September 17, 2021, Father, through counsel, filed a timely notice of appeal, as well as a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issues for our review:

1. Whether the trial court erred and/or abused its discretion in terminating [Father's] parental rights pursuant to Title Pa 23 Section 2511(a) because [Father] had contact with the child during six months immediately prior to the date of [Mother's] filing [her] petition to terminate parental rights?

2. Whether the trial court erred and/or abused its discretion in terminating [Father's] parental rights in giving primary consideration pursuant to the factors set forth in 23 Pa.C.S.A. Section 2511(b) (developmental, physical, and emotional needs and welfare of the child) because testimony presented at trial established a the [sic] child and [Father] have a bond that would be detrimental to the physical, emotional, and general well-being of the minor child if the bond were to be severed?

Father's Brief, at 3 (suggested answers omitted).

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the

needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court found sufficient grounds to terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), which provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties. …

23 Pa.C.S.A. § 2511(a)(1).

Father first argues the trial court abused its discretion in terminating his parental rights under Section 2511(a)(1) because Father claims that he neither exhibited a settled purpose to relinquish his parental claim nor refused to perform parental duties. Instead, Father asserts that he was unable to visit or contact Child as Mother allegedly prevented him from doing so.

We have recognized that a trial court may terminate parental rights under Section 2511(a)(1) "where the parent demonstrates a settled purpose to relinquish parental claim to a child **or** fails to perform parental duties for at least the six months prior to the filing of the termination petition." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super. 2010) (emphasis in original). "[A]lthough it is the six months immediately preceding the filing of the petition that is most critical in the analysis, the trial court must consider the whole history of [the] case and not mechanically apply the six-month statutory provision." *In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004) (citing *In re D.J.S.*, 737 A.2d 283, 286 (Pa.Super. 1999)).

With respect to the inquiry as to whether the parent refused or failed to perform parental duties, our courts have held that:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'
>
> *In re C.M.S.,* 832 A.2d 457, 462 (Pa.Super. 2003) (citing *In re Burns,* 474 Pa. 615, 379 A.2d 535 (1977)). *See In re: G.P.-R.,* 851 A.2d 967, 976, (2004) (internal citation omitted).

- 9 -

*In re B.,N.M*., 856 A.2d at 855-56.

Our Supreme Court has clarified that:

even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months as required by Section 2511(a)(1), the court "must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental right. Consideration of the totality of the circumstances includes evaluation of the following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b). We reiterate that the purpose of this analysis is to give effect to our mandate that courts avoid a mechanical application of the law regarding the termination of parental rights. The law must be applied with the purpose of serving needs and welfare of each individual child in his or her particular circumstances.

*In re Adoption of L.A.K.*, 14 WAP 2021, 2021 WL 6071745, at *8 (Pa. Dec. 23, 2021).

Within this analysis, courts must evaluate whether the non-custodial parent faced barriers or obstacles that prevented them from maintaining their relationship with their child. This Court has emphasized that:

[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. *In re Adoption of Dale A., II,* 453 Pa.Super. 106, 683 A.2d 297, 302 (1996) (internal citations omitted). A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. *In re C.M.S., supra* at 462 (citing *In re Shives,* 363 Pa.Super. 225, 525 A.2d 801 (1987)). Parental rights are not preserved by waiting for a more

- 10 -

suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. *In re D.J.S., supra* at 287.

\*\*\*

Where a non-custodial parent is facing termination of his or her parental rights, the court must consider the non-custodial parent's explanation, if any, for the apparent neglect, including situations in which a custodial parent has deliberately created obstacles and has by devious means erected barriers intended to impede free communication and regular association between the non-custodial parent and his or her child. *In re C.M.S., supra* at 463 (quoting *In re Shives, supra* at 803). Although a parent is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances. *In re: G.P.-R., supra* (internal citation omitted). A parent has the duty to exert himself, to take and maintain a place of importance in the child's life. *Id.*

*In re B.,N.M*., 856 A.2d at 855-56.

In *In re B.,N.M.*, this Court reversed a trial court's order finding that the mother failed to show that there were adequate grounds for the termination of the father's parental rights under Section 2511(a)(1) when the trial court focused on the fact that the mother had prevented the father from visiting or communicating with the child.

In viewing the parties' conduct in the totality of the circumstances, this Court found that the trial court failed to also consider the father's obligation to take affirmative steps to overcome purported obstacles that prevented him from establishing a close relationship with the child. *Id*. at 856. This Court found that the father did not take proactive steps to exert himself in the child's life and found his excuses insufficient to justify his inaction, given that the father did not pursue legal action to establish visitation with the child, did not

attempt to establish any contact with the child, and was simply waiting for the child's mother to decide when it was appropriate for the father to contact the child.

In the instant case, Mother stopped allowing Father to have contact with Child in September 2019 after she observed Father had driven Child to Mother's house from football practice while intoxicated. While Father subsequently sent text messages to Mother to ask how Child was doing, Father did not make any attempt to contact or visit with Child from March 2020 to September 2020. N.T., 2/24/21, at 31. Father did not file any legal action to assert his parental rights to Child but admitted that he was waiting for the parties' problems to "blow over."

Even after Mother filed a petition to terminate Father's parental rights in September 2020, Father did nothing to assert his parental rights to Child and ceased all contact with Mother. Father did not call or send gifts to Child for his birthday or for Christmas in 2021. *Id*. at 34. Father did not perform any parental duties from September 2019 and instead relied on Mother and Stepfather to provide for all of Child's needs.

While Father essentially concedes that he failed to perform parental duties for Child for more than six months before the termination petition was filed and had minimal post-abandonment contact with Child, Father explains that he was unable to do so because Mother prevented him from seeing or contacting Child and threatened to file a protection from abuse if Father harassed her family.

- 12 -

While we acknowledge that Mother declined to allow Father to visit with Child after September 2019, Father failed to act to the best of his ability to meet his obligation to maintain a relationship with Child in the face of the obstacles Mother placed before him.  Similar to the parties in ***In re B.,N.M.***, Mother's behavior "did not prevent Father from using reasonable firmness to pursue alternative possibilities for maintaining contact with Child."  ***In re B.,N.M.***, 856 A.2d at 856.   Father did not consider or attempt to file legal action to regain visitation rights to Child and he admitted that Mother did not do anything to prevent him from filing for custody.  N.T., 2/24/21, at 108.

On cross-examination, Father explained that he did not file for custody or visitation as he did not want to make Mother upset.  The following exchange occurred when Father was asked how he planned to reestablish a relationship with Child after he had not contact with Child since September 2019:

> Attorney Basco:  And again, I want you to tell me very specifically when Mom said you can't see your son anymore whether it's because she didn't want it or your son said he didn't want it or she said your son didn't want it, what was your plan to get back with your son?
>
> Father:  My plan was that if it went too far, I was going to go to court.  I just – I just let it go and maybe that – like I said, maybe that everything would be all right.
>
> Attorney Basco: And what does going too far mean?  What is that timeline?
>
> Father: Now…
>
> Attorney Basco: Okay. So 18 months?  That's the timeline?
>
> Father: You know, you can say it like that.  You can sit up there and say – and say 18 months like I don't care about my son, but I do, but I do, so what – you know, I'm –

- 13 -

> Attorney Basco: I just wanted to know your timeline, and I think everybody wants to know your timeline.
>
> Father: I didn't have a timeline. I wanted to see my son. I didn't have a timeline.

*Id*. at 120-21.

Despite Father's pleas at the termination hearing to see his son and his assertion that he did not want his parental rights to be terminated, Father failed to exert reasonable diligence to contact his son and to maintain a place of importance in Child's life. This Court has held that "[a] parent cannot protect his parental rights by merely stating that he does not wish to have his rights terminated." *In re B.,N.M.*, 856 A.2d at 856 (citation omitted).

We agree with the trial court's assessment that Father "was his own barrier and permitted his lack of sobriety to keep him away from his child." Trial Court Opinion (T.C.O.), 10/18/21, at 16. The trial court pointed out that it did not find Father's testimony compelling and also found it difficult to believe Father's claim that he was eight months sober on the date of the termination hearing held in February 2021 and had not purchased any alcohol during that time.

When Father was confronted on cross-examination with his bank account statements showing that he had made numerous purchases of liquor throughout October, November, and December of 2020, Father then admitted that he had made these purchases of port wine, which was his drink of choice. N.T., 2/24/21, 94-97. However, Father claimed that he bought the alcohol for his girlfriend and averred that he himself was not drinking. Nevertheless,

- 14 -

Father conceded that AA recommends that individuals struggling with sobriety should not purchase alcohol for other people.  *Id*.  Father claimed to have gone to AA meetings but did not participate in any treatment for his alcoholism.  *Id*.

When viewing the totality of the circumstances, we agree with the trial court's conclusion that there were sufficient grounds for the termination of Father's parental rights under Section 2511(a)(1).  Father did not preserve his parental rights by waiting for Mother to designate a more convenient time for Father to perform parental duties while Mother and Stepfather consistently provided for Child's physical and emotional needs.

As noted above, after having determined that the statutory grounds for termination have been met pursuant to Section 2511(a), we now must consider whether the trial court properly found that termination serves the best interests of Child as set forth in Section 2511(b).  Father claims that the termination would be harmful to Child's developmental, physical, and emotional needs and welfare.  Father asserts that it would be to Child's detriment to break the bond Child has with Father.

Section 2511(b) provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by

the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

As to Section 2511(b), our Supreme Court has stated as follows:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.* [*a/k/a E.W.C. & L.M. a/k/a L.C., Jr.*], [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628, 71 A.3d at 267.

When evaluating a parental bond, "the court is not required to use expert testimony. … Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted). Moreover,

[w]hile a parent's emotional bond with his or her child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting

*In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and

citations omitted).

In considering Child's bond with Father, the trial court summarized

Child's testimony about Father as follows:

> [C]hild, who is eleven years old, testified about his father and indicated that his father was not that nice. According to J.A.B., his father was "pretty mean." [C]hild indicated that his father always yelled at him and hit him at times for no reason. According to [Child], his father never likes to spend any time with him and all he does is watch television. N.T., 3/5/21, at 7. [C]hild testified that when he woke his father up from naps, his father would hit him. [C]hild further testified that many times his father would forget to feed him. *Id*. at 8. [C]hild also indicated that many times his father would promise to do an activity with him; however, he would break his promise and not do anything with him. *Id*. at 9, 11. [C]hild stated that he would like his stepfather to adopt him because then he would have a father that actually cares about him. *Id*. at 11.
>
> [C]hild further testified that he believed [S]tepfather is "a good dad." *Id*. at 15. [C]hild further indicated that he is frightened of his father. *Id*. at 17. [C]hild further stated that he feels safer with his stepfather than his father. *Id*. at 19.

T.C.O. at 19.

Child's testimony demonstrates there is the lack of evidence that

severing the ties between Father and Child would have a negative affect on

Child. In addition, Child and Mother expressed fear for Child's safety in

Father's care, as Father would be intoxicated in Child's presence, forget to

give Child meals, and enter such deep sleep that he was difficult to wake up.

Moreover, Father appeared to be intoxicated in driving Child home from football practice and Child testified that Father acted strangely when he got in other vehicular accidents in Child's presence. Child indicated that Father told him not to tell Mother about the accidents. N.T., 3/5/21, at 13-14. When Child did tell Mother about the accidents, Child asserted that Father made him feel really bad as if Child did something wrong. *Id*.

In contrast, the trial court found that in Father's absence, Mother and Stepfather have provided for Child's physical, developmental, and emotional needs. The trial court specifically found as follows:

Mother testified that both she and [S]tepfather are employed and can physically provide for [Child's] needs. N.T. 2/24/21, at 129. Mother testified that [Child] has his own bedroom and they provide him with food and shelter.

Mother testified that she and [S]tepfather also provide for [C]hild's emotional needs. If [C]hild has any issues, he comes to Mother or [S]tepfather to discuss these issues. Mother also indicated that [Child] has a good relationship with his stepsiblings. *Id*. at 131. Mother testified that [Child] misses [S]tepfather every day when he goes to work. Mother indicated that there is a strong bond between [C]hild and [Stepfather]. [C]hild refers to [S]tepfather as his father. *Id*. at 132. Stepfather also treats [C]hild as if he is one of his own. *Id*. at 138.

Mother testified that [C]hild's developmental needs are also met. [C]hild is involved in extracurricular activities such as Boy Scouts. He also plays the guitar and clarinet. *Id*. … Stepfather taught [Child] how to ride a bike and helps [C]hild with his homework. *Id*. at 134, 138. …

Stepfather testified that his relationship with [C]hild is the same as with his other biological children. *Id*. at 139-40. Stepfather testified that he understood that in the event that he adopts [C]hild, he would be required to treat the child as if he was his naturally born child for purpose of inheritance, child custody

issues, and child support issues. *Id*. at 140. Stepfather further testified that he is involved in Boy Scouts with [C]hild. He also takes him camping. He also took [C]hild for his flu shot and for other medical appointments. Stepfather testified that he loves [C]hild and that love is reciprocated by [C]hild. *Id*. at 142. Stepfather testified that he was aware that in the event that he would be able to adopt [Child], that he would be financially obligated to support [C]hild until he turns 18. He indicated that he was willing to assume that responsibility. *Id*. at 148. [Stepfather] testified that although he and Mother considered [C]hild's preference in wanting the termination of Father's parental rights, they also considered [C]hild's safety and overall well-being. *Id*. at 148-49.

T.C.O. at 16-17.

Thus, the record supports the trial court's finding that Child's developmental, physical and emotional needs and welfare favor termination of parental rights pursuant to Section 2511(b). *See T.S.M.*, 620 Pa. at 628, 71 A.3d at 267.

While Father may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. Child is entitled to permanency and stability. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d at 856 (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S.A. § 2511(a)(1) and (b).

Decree affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/04/2022